JESSE THORNSBURY, ADMINISTRATOR

OF THE ESTATE OF CAROL SUE THORNSBURY,

AND JESSE THORNSBURY AS AN INDIVIDUAL

*v.*

MAE THORNSBURY

(No. 12208)

Submitted May 14, 1963.          Decided June 18, 1963.

W. H. *Ballard, II, C. Thomas Seay,* for appellants.

*Crockett, Tutwiler & Crockett,* for appellees.

CALHOUN, JUDGE:

This case involves an appeal from the final judgment of the Circuit Court of McDowell County entered on a jury verdict directed by the court in favor of the defendant in an action by Jesse Thornsbury, as an individual and in his capacity as administrator of the estate of his deceased daughter, Carol Sue Thornsbury, against Mae Thornsbury. The case arose from personal injuries to Carol Sue Thornsbury, a sixteen-year old girl, resulting in her death, as a consequence of an accident in the State of Ohio involving an automobile in which she was a guest passenger and which was being driven by Mae Thornsbury, her aunt.

Inasmuch as the automobile accident occurred in Ohio, the right to recover must be measured and determined in accordance with the laws of that state. *Forney* v. *Morrison,* 144 W. Va. 722, pt. 2 syl., 110 S. E. 2d 840, 18 A.L.R. 2d 1287; *Tice* v. *E. I. du Pont de Nemours & Co.,* 144 W. Va. 24, pt. 1 syl., 106 S. E. 2d 107, 42 A.L.R. 2d 1170; *Dodrill* v. *Young,* 143 W. Va. 429, pt. 1 syl., 102 S. E. 2d 724. The rule applies to actions for wrongful death as well as to actions for personal injuries not resulting in death. 25 C.J.S., Death, Section 28, page 1097; *Barrell* v. *Wessel,* (La.) 65 So. 2d 818. The rule applies with full force also in the application of the guest statute of the foreign state in which the cause of action arose. *Dodrill* v. *Young,* 143 W. Va. 429, 102 S. E. 2d 724; *De Shetler* v. *Kordt,* 43 Ohio App. 236, 183 N. E. 85.

We are authorized by Code, 1931, 57-1-4, to take judicial notice of the statutory and case law of another state. *Gardner* v. *Gardner,* 144 W. Va. 630, 639-40, 110 S. E. 2d 495, 501. Section 4515.02, Ohio Revised Code, is as follows: "The owner, operator, or person responsible for the operation of a motor vehicle shall not be liable for loss or damage arising from injuries to or death of a guest, resulting from the operation of said motor vehicle, while such guest is being transported without payment therefor in or upon said motor vehicle, unless such injuries or death are caused by the willful or wanton misconduct of such operator, owner, or person responsible for the operation of said motor vehicle."

In our review of the action of the trial court in directing the verdict for the defendant, we are called upon to decide the basic and primary question whether the evidence tending to show "willful or wanton misconduct" on the part of the defendant driver is sufficient to make that question a proper one for jury determination.

Jesse Thornsbury, who sues in his dual capacity as administrator and as an individual, will be referred to as the plaintiff. The court granted to the plaintiff leave to move to reverse the judgment of the trial court pursuant to the provisions of Code, 1931, 58-5-25, and consequently the case was submitted on the original record as distinguished from a printed record.

The motion for a directed verdict in favor of the defendant was made and sustained at the conclusion of the plaintiff's case in chief. Three witnesses testified in behalf of the plaintiff. Jesse Thornsbury, the plaintiff, father of Carol Sue Thornsbury, the sixteen-year old girl who was killed in the accident, testified concerning facts of a purely formal nature. He was not in the automobile at the time of the accident and therefore had no personal knowledge of the facts pertaining thereto. Ralph Knight, a state highway patrolman of the State of Ohio, investigated the circumstances of the accident immediately following its occurrence. His deposition taken in Ohio was read to the jury in behalf of the plaintiff. Mae Thornsbury, the defendant, was called as an adverse witness by the plaintiff pursuant to R. C. P. 43 (b),

which is as follows: "A party may interrogate any unwilling or hostile witness by leading questions. A party may call an adverse party or an officer, director, or managing agent of a public or private corporation or association which is an adverse party, and interrogate him by leading questions and contradict and impeach him in all respects as if he had been called by the adverse party, and the witness thus called may be contradicted and impeached by or on behalf of the adverse party also, and may be cross-examined by the adverse party only upon the subject matter of his examination in chief." We must necessarily look primarily to the testimony of the defendant, Mae Thornsbury, in this connection because neither of the other witnesses was an eyewitness to the accident or had personal knowledge of the facts and circumstances which immediately led up to and resulted in the accident.

No question is presented concerning what items of damage are recoverable in this case by the plaintiff in his capacity as administrator or in his capacity as an individual and hence such matters are not considered by this Court.

On August 5, 1960, Mae Thornsbury and her husband, Ted Thornsbury, lived in McDowell County near the home of Jesse Thornsbury and Dixie Thornsbury, his wife. Mae Thornsbury and Dixie Thornsbury are sisters. About five o'clock in the afternoon of that day, Ted Thornsbury and Mae Thornsbury left their home to go to the home of their daughter at Conneaut, located on Lake Erie in northeastern Ohio. The purpose of the trip was to return their young granddaughter to the home of her parents. When the group left McDowell County in an automobile owned by Ted Thornsbury, he was driving. The occupants of the automobile from that time and place to the time and scene of the accident were Ted Thornsbury, Mae Thornsbury, his wife, their two sons, their granddaughter and their neice, Carol Sue Thornsbury. The two sons were aged 15 and 16, respectively, and the granddaughter was five years of age.

Ted Thornsbury continued to drive until the group left the tip of the Northern Panhandle of this state and crossed

the Ohio River into East Liverpool, Ohio. At that place gasoline was obtained for the automobile and members of the group went to restrooms at a service station. After driving on Ohio Route 45 for a short distance beyond East Liverpool, Ted Thornsbury became ill and consequently Mae Thornsbury drove the automobile from that point to the scene of the accident. In traveling on Route 45, the group proceeded almost directly northward. As they neared Ashtabula, Ohio, they crossed Route 84 which, speaking generally runs east and west. The accident occurred immediately beyond the intersection of the two highways. Mae Thornsbury commenced to drive about three-thirty o'clock and the accident occurred after daylight on the early morning of August 6.

Southward on Route 45 from its intersection with Route 84 were two highway signs, one on each side of the highway, each sign bearing the words "Stop Ahead". There was a "stop sign" on the right of Route 45 immediately south of the intersection. Both highways are comparatively straight and level at and near the point of intersection. The weather was clear and the highways were dry. Carol Sue Thornsbury was riding on the right side of the front seat of the two-door automobile and apparently the granddaughter was seated between her and Mae Thornsbury, the driver. On cross-examination by counsel for the defendant, Knight testified without objection: "Based upon my observation from the skid marks, the speed at which I would estimate the car had been going and so forth, I felt myself that the car had not stopped for the stop sign."

Route 45 at the scene of the accident is a two-lane highway eighteen feet wide. On the right side the berm was about three inches lower than the pavement. The right wheels of the automobile apparently ran off the right edge of the pavement. Thereafter it came back upon the pavement and proceeded diagonally across the highway, off the left side, down a slight embankment, through a wire fence and came to rest about forty-six feet from the edge of the pavement. During the diagonal course of travel, a 48-foot skid mark was made by the right front wheel and a 60-foot

skid mark was made by the right rear wheel. No skid marks were made by the left wheels. Apparently Carol Sue Thornsbury was asleep immediately before the occurrence of the accident. When the automobile came to rest, she was pinned under the right rear spring or wheel. She was conscious at the time. Later she was removed by ambulance to a hospital where her death occurred.

On the morning of Friday, August 5, 1960, Mae Thornsbury arose about five-thirty. There is no evidence that she slept during the period of approximately twenty-four hours immediately preceding the time of the occurrence of the accident. She testified that after she commenced to drive the automobile, she became sleepy. Though she did not remember at what point of time and place she first became sleepy, she stated: "All I really know is that is an awful long road and an awful straight one, and I remember, I recall going through one town and there was a red light and I seemed to be pretty sleepy and I went on through this town and I think I got roused up * * *. Well, I think that after I went through this town, I seen the red light, and I think I shook the sleep off, the best I remember at that time, and I continued driving on this straight road * * *. Yes, and this road was very straight, like I say, and I begun to get sleepy again and I was pretty sleepy and I pulled off of the road the best I can and it had begun to get daylight * * *. I thought I would check my signal lights and all, and I got out and walked around to the back of the car and I noticed the house were setting right up on the bank from where I stopped and it seemed like a fear ran over me or something that these people might think I was trying to steal something and I wasn't out of the road good, so I seen my signal lights were all working properly and I come back and got in the car and proceeded on. Of course, I was still sleepy but that aroused me quite a bit, to the best of my knowledge, and I proceeded on; and I said if I would get to thinking I would soon be there, or that I would come to a restaurant or something and get some coffee, which I didn't find any restaurants open at that time of the morning, and all the places that I seemed to find led into a private driveway." She

stated that she knew that she was sleepy and that while the automobile was standing on the edge of the highway, her husband became aroused from sleep and offered to drive but that she replied: "I think I can make it on." She was asked the following questions and gave the following answers:

"Q. Did you know actually, Mrs. Thornsbury, how far you were from Conneaut, or did you just figure you were reasonably close and could make it all right?

"A. No, sir, I don't know how far it was. I know my baby had been reading the map and sometimes she would say twenty miles and sometimes say two. I would think, 'If it is only two miles, surely I can make it on.'

"Q. So you kept pushing yourself, driving yourself, knowing you were sleepy, in the hope that you could make it on all right. Is that right?

"A. Yes. I continued on."

Mrs. Thornsbury did not recall having seen the three highway signs along Route 45 south of the intersection and she did not know whether she stopped or did not stop before entering the intersection. In relation to the actual occurrence of the accident, she gave the following testimony:

"A. I really don't remember too much about it, it don't seem like.

"Q. Well, tell what parts of it you do remember?

"A. I just remember that I was very sleepy.

"Q. Go ahead?

"A. And I think the baby roused, I am not sure, and it seems like she was laying with her head in my lap or something, I don't remember exactly, and I was thinking I would stop and it seems like I put on my brakes and I didn't see any place to stop that I could get the car off the road, and I still had my foot on the brake looking for a place to stop, and the next thing I know, I seem to be cutting the car. It must have rolled off the side of the road on the right. The front wheel must have rolled off. I am not sure.

"Q. The front wheel must have rolled off the hard surface on the berm on the right. Is that what you mean?

"A. I guess that is what happened.

"Q. When you say you cut your car, how did you cut your car?

"A. I just seemed to be cutting it. It all seems —I might have got scared or something—I don't know, I seemed to be cutting the car."

From the testimony, facts and circumstances properly appearing in this case, a jury would be reasonably warranted in finding that Mae Thornsbury, with full awareness of her drowsiness, and with adequate forewarning of the hazard involved, continued over a considerable distance and period of time to drive the automobile on a strange highway with an attitude of persistence and doggedness; and that her doing so was willful or wanton misconduct on her part which proximately caused the death of Carol Sue Thornsbury. Her attitude of awareness, persistence and doggedness is illustrated by her statement, "I would think, 'If it is only two miles, surely I can make it on.'" She made a written, signed statement to the state highway patrolman as follows: "I was driving north on Rt. 45 and had noticed myself getting sleepy. I must have fallen asleep and then I remember hitting the brakes sharply." Mae Thornsbury was not merely a witness; she is also the party defendant. The statement which she made to the investigating officer was admissible in evidence against her as an extrajudicial admission. The Law of Evidence in Virginia and West Virginia, Section 160, page 288; 31 C.J.S., Evidence, Section 272, page 1023; *Reall* v. *Deiriggi*, 127 W. Va. 662, 667, 34 S. E. 2d 253, 256; *Morrison* v. *Judy*, 123 W. Va. 200, pt. 4 syl., 13 S. E. 2d 751; *Keatley* v. *Hanna Chevrolet Co.*, 121 W. Va. 669, pt. 3 syl., 6 S. E. 2d 1; *Beamer* v. *Clayton*, 82 W. Va. 580, pts. 3 and 5 syl., 96 S. E. 969; *The Star Grocery Co.* v. *Bradford*, 70 W. Va. 496, pt. 3 syl., 74 S. E. 509.

This Court has observed in a number of cases that negligence conveys the idea of heedlessness, inattention or inadvertence, while willfulness and wantonness convey the idea

of purpose or design, actual or constructive. *Stone* v. *Rudolph,* 127 W. Va. 335, 349, 32 S. E. 2d 742, 749; *Kelly* v. *Checker White Cab, Inc.,* 131 W. Va. 816, 822, 50 S. E. 2d 888, 892; *Spence* v. *Browning Motor Freight Lines, Inc.,* 138 W. Va. 748, 754, 77 S. E. 2d 806, 810. See also Restatement of The Law of Torts, Section 500, page 1293; *Alderman* v. *Baltimore & Ohio Railroad Co.* (W. Va.) 113 F. Supp. 881, 883. " 'Willful or wanton misconduct' within a guest statute means intentionally doing something in the operation of a motor vehicle which should not be done or intentionally failing to do something which should be done under circumstances disclosing knowledge, express or implied, that an injury to a guest is a probable, as distinguished from a possible, result." 60 C.J.S., Motor Vehicles, Section 399 (4), page 1001. See also 8 Am. Jur. 2d, Automobiles and Highway Traffic, Section 488, page 55.

In *Tighe* v. *Diamond,* 149 Ohio St. 520, pt. 4 syl., 80 N. E. 2d 122, the court stated: " 'Wilful misconduct' on the part of a motorist within the meaning of the Ohio guest statute, * * * is either the doing of an act with specific intent to injure his passenger, or with full knowledge of existing conditions, the intentional execution of a wrongful course of conduct which he knows should not be carried out or the intentional failure to do something which he knows should be done in connection with his operation of the automobile, under circumstances tending to disclose that the motorist knows or should know that an injury to his guest will be the probable result of such conduct." See also *Ulrich* v. *Massie,* 89 Ohio App. 362, 102 N. E. 2d 274; *Russell* v. *Elkins* (Ohio), 177 N. E. 2d 355. The following is from the syllabus of *Helleren* v. *Dixon,* 152 Ohio St. 40, 86 N. E. 2d 777: "Within the meaning of Section 6308-6, General Code, wanton misconduct is such conduct as manifests a disposition to perversity, and it must be under such surrounding circumstances and existing conditions that the party doing the act or failing to act must be conscious, from his knowledge of such surrounding circumstances and existing conditions, that his conduct will in all common probability result in injury." See also *Russel* v. *Elkins* (Ohio), 177 N. E. 2d 355; *Bailey* v. *Huff* (Ohio), 152 N. E. 2d 162; *Schulz* v. *Fible,* 71

Ohio App. 353, 48 N. E. 2d 899; *Universal Concrete Pipe Co.* v. *Bassett*, 130 Ohio St. 567, 200 N. E. 843.

"Guest statutes, like the one in Ohio, being in derogation of the common law, are to be strictly, albeit reasonably, construed. *Miller* v. *Fairley*, 141 Ohio St. 327, 48 N. E. 2d 217; *Vest* v. *Kramer*, 158 Ohio St. 78, 84, 107 N. E. 2d 105, 108; 60 C.J.S., Motor Vehicles, Section 399 (3), p. 966." *Clinger* v. *Duncan*, 166 Ohio St. 216, 141 N. E. 2d 156, 160. "Such statutes, being in derogation of the common law, must be strictly construed against the host and liberally construed in favor of the guest. Although they should be construed with their intent and purpose in view, and consideration given to all the language employed, they should not be extended beyond correction of the evils and attainment of the social objects which it may be assumed were the inducing reasons for their enactment, or so restricted as to defeat or impair those purposes." 60 C.J.S., Motor Vehicles, Section 399 (3), page 996.

We are not aware of any reported case from Ohio involving drowsiness as a basis for finding of willful or wanton misconduct. In an exhaustive annotation of the question now under consideration, and related matters, appearing in 28 A.L.R. 2d, the following summaries of reported decisions appear at pages 71 and 72:

"The mere showing that the driver of an automobile went to sleep at the wheel without more does not by itself show such a marked disregard for the safety of others as to amount to wilfulness or wantonness. Consequently, evidence that the driver of a motor vehicle fell asleep while driving is not sufficient in itself to carry the issue of the driver's wantonness or wilfulness to the jury. ****

"A driver of an automobile is not guilty of wanton or wilful misconduct in falling asleep while driving unless it appears that he continued to drive in reckless disregard of premonitory symptoms. Generally speaking, if it appears that the driver of an automobile has been without sleep for a considerable period of time and has experienced symptoms of the approach of sleep, the fact that he continues to drive

under such circumstances has been held to manifest a wilful and wanton disregard for the safety of others within the meaning of the applicable guest statute."

We believe that in a situation such as this a case for the jury is established if there is credible evidence from which the jury may reasonably determine that the accident and consequent damage were caused proximately by the conduct of the host driver in continuing to drive the motor vehicle in conscious and reckless disregard of premonitory symptoms of drowsiness and the approach of sleep. The essential elements of willfulness and wantonness may be determined by a jury in such circumstances by the act of the driver in continuing to drive with full awareness of his drowsy condition and in disregard of the hazard of which he should be aware in such circumstances. Willfulness and wantonness do not necessarily imply an intention or design to inflict the injuries which ultimately resulted. The willful or wanton misconduct, in proper circumstances, may be determined by the jury from the conduct of the defendant in continuing to drive in reckless disregard of the premonitory symptoms of drowsiness. In addition to authorities previously referred to, we believe that the following recent cases tend to substantiate our view that the issue of the defendant's willful or wanton misconduct was one which should have been submitted to the jury: *Hodges* v. *Ladd*, (Colo.) 352 P. 2d 660; *Baker* v. *Williams*, (Colo.) 357 P. 2d 61; *Smith* v. *Northern Insurance Co.*, (La.) 120 So. 2d 309; *Notare* v. *Notare*, 64 N. J. Super. 589, 166 A. 2d 816; *Emery* v. *Emery*, 45 Cal. 2d, 421, 289 P. 2d 218; *Halstead* v. *Paul*, 129 Cal. App. 2d 339, 277 P. 2d 43; *Ausmus* v. *Swearingen*, (Mo.) 296 S. W. 2d 8; *Wilcox* v. *Swenson*, (Mo.) 324 S. W. 2d 664; *Henderson* v. *Henderson*, 11 Misc. 2d 499, 169 N.Y.S. 2d 106.

In the circumstances of this case, we believe it was proper for the jury to have determined whether the accident and consequent death resulted from willful or wanton misconduct on the part of the defendant, and that the trial court erred in taking the case from the jury and in directing a verdict in favor of the defendant. Before directing a verdict in the defendant's favor, every reasonable inference favor-

able to the plaintiff fairly arising from the evidence, considered as a whole, should be entertained by the trial court, and those facts should be assumed as true which the jury may properly find from the evidence. *Spaur* v. *Hayes,* 147 W. Va. 168, pt. 1 syl., 126 S. E. 2d 187; *Reilly* v. *Byard,* 146 W. Va. 292, pt. 5 syl., 119 S. E. 2d 650; *Costello* v. *The City of Wheeling,* 145 W. Va. 455, pt. 3 syl., 117 S. E. 2d 513; *Fielder, Admx.* v. *Service Cab Co.,* 122 W. Va. 522, pt. 1 syl., .11 S. E. 2d 115; *Nichols* v. *Raleigh-Wyoming Coal Co.,* 112 W. Va. 85, syl., 163 S. E. 767.

Other errors relied upon by the plaintiff should be considered in view of the possibility of a new trial. It is urged that the trial court erred in refusing to permit counsel for the plaintiff to propound to the jurors the following question as part of the *voir dire* examination: "Should the evidence disclose to you and you should be of the opinion that the plaintiffs are entitled to win, entitled to recover, do any of you feel that $25,000 is too much for the death of a 16 year old girl?" The nature and extent of the questions propounded to the jurors on the *voir dire* examination should be left largely to the discretion of the trial court and a case will not be reversed in a situation of this nature unless it clearly appears that the discretion has been abused. *Henthorn* v. *Long,* 146 W. Va. 636, pt. 4 syl., 122 S. E. 2d 186; *State* v. *Beacraft,* 126 W. Va. 895, pt. 2 syl., 30 S. E. 2d 541; *State* v. *Stonestreet,* 112 W. Va. 668, pt. 1 syl., 166 S. E. 378. It is difficult to conceive what contribution to a fair trial or to proper administration of justice could result from permitting such question to be propounded and answered. It would be about as logical to permit counsel for the defendant to inquire of the jurors whether in the opinion of each of them the sum of $10,000 would be adequate. In *Henthorn* v. *Long,* 146 W. Va. 636, 122 S. E. 2d 186, 196, this court held that the trial court did not abuse its discretion in refusing to propound a similar question, stating: "We feel that the trial court acted with complete propriety in this respect. This proposed inquiry seems to be a technique sometimes advocated as a means of inducing juries to return big verdicts. Courts are not interested in any device or technique designed to induce either large verdicts or small verdicts;

but courts are under a solemn obligation at all times to keep the symbolic scales of justice delicately balanced so that every inducement will be held out to the jury, so far as mortal capacity permits, to render a *fair* verdict. If such an inquiry were propounded and answered in the affirmative by the twelve jurors ultimately selected for trial of the case, there might result a dangerous field for adroit and resourceful counsel in final argument to portray such affirmative answer as something in the nature of a tacit promise to return a verdict for the amount specified in the inquiry. We feel that the trial court, in refusing to propound such inquiry, exercised its discretion wisely in the interest of justice." The trial court committed no error in refusing to permit the inquiry to be propounded to the jury.

Error is assigned to the action of the court in refusing to permit Knight, the highway patrolman, to state what one of Mae Thornsbury's sons told him at the scene of the accident "as to how the accident happened." Perhaps an answer to the question was made a part of the deposition but no answer appears from the court reporter's transcript of the proceedings at the trial. The answer, if any, not being before us, we cannot determine whether the court erred in refusing to permit the answer to be read to the jury. *Price Hill Colliery Co.* v. *Pinkney*, 96 W. Va. 74, pt. 3 syl., 122 S. E. 434; *Wilson* v. *Fleming*, 89 W. Va. 553, 563, 109 S. E. 810, 815; *Davis* v. *Laurel River Lumber Co.*, 85 W. Va. 191, pt. 3 syl., 101 S. E. 447; *Sayre* v. *Woodyard*, 66 W. Va. 288, pt. 1 syl., 66 S. E. 320; *Lord & McCracken* v. *Henderson*, 65 W. Va. 321, pt. 2 syl., 64 S. E. 134; *Delmar Oil Co.* v. *Bartlett*, 62 W. Va. 700, pts. 5 and 6 syl., 59 S. E. 634; *Kay* v. *Glade Creek & R. R. Co.*, 47 W. Va. 467, pt. 3 syl., 35 S. E. 973; *Jackson* v. *Hough*, 38 W. Va. 236, pt. 6 syl., 18 S. E. 575; *Nease* v. *Capehart*, 15 W. Va. 299, pt. 7 syl.

In the taking of the deposition of Knight, the highway patrolman, he was asked on cross-examination by counsel for the defendant whether he made "any charge against Mae Thornsbury" as a consequence of the accident, and he replied in the negative. Error is assigned to the action of the court in permitting that evidence to go to the jury over the

objection of counsel for the plaintiff. If it were proper to prove that the officer did not prefer a criminal charge against the driver, it would be proper to prove, if such were a fact, that he did prefer such a charge. Perhaps questions of this nature are designed indirectly to convey to the jury an impression of the officer's opinion that the driver was or was not at fault or that the driver was or was not guilty of some traffic law violation; but it would be improper through that course to admit in evidence the opinion of the officer when such could not be done directly.

A plea of guilty by the driver to a charge of a traffic violation in connection with the accident involved in the civil action for damages may be admissible as an admission. *Utt v. Herold,* 127 W. Va. 719, pt. 1 syl., 34 S. E. 2d 357; *Moore v. Skyline Cab, Inc.,* 134 W. Va. 121, 132, 59 S. E. 2d 437, 443-44. As to the inadmissibility of a plea of *nolo contendere,* see *Schad v. McNinch,* 103 W. Va. 44, pt. 2 syl., 136 S. E. 865. A prior conviction of a criminal offense is admissible solely on the question of credibility. *State v. Friedman,* 124 W. Va. 4, 18 S. E. 2d 653. The mere pendency of a charge of a traffic violation or the absence of such a charge can have no relevancy in a situation such as this. "Ordinarily, and except in so far as it embraces an admission by the defendant, evidence relating to * * * criminal proceedings against the driver of a motor vehicle involved in the accident or collision, is inadmissible." 61 C.J.S., Motor Vehicles, Section 516m, page 259. "Evidence of the pendency of a prosecution for reckless driving is irrelevant in an action for damages." 8 Am. Jur. 2d, Automobiles and Highway Traffic, Section 944, page 490. For reasons stated, the Court holds that the trial court erred in permitting the defendant to prove that the investigating officer did not prefer a criminal charge against Mae Thornsbury. Since the judgment is reversed on another ground, it is not necessary that we determine whether the error in admitting the evidence was of such a prejudicial nature as to be regarded as a reversible error.

For reasons stated, the motion to reverse is sustained, the judgment of the Circuit Court of McDowell County is af-

firmed in part and reversed in part, the verdict is set aside, and the plaintiff is awarded a new trial.

*Affirmed in part;*
*reversed in part;*
*verdict set aside;*
*new trial awarded.*